## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---

UNITED STATES OF AMERICA,

v.

RICHARD HAJJAR

                Defendant.

Case No. 1:21-cr-10116-NMG

---

### DEFENDANT RICHARD HAJJAR'S SENTENCING MEMORANDUM AND MOTION FOR VARIANCE FROM THE SENTENCING GUIDELINES AND A SENTENCE WITHIN THE RANGE AGREED TO BY THE PARTIES

**I.**      **Introduction**

The defendant, Richard Hajjar ("Mr. Hajjar" or "Rick") takes full responsibility for embezzling nearly $30 million from his employer, Alden Shoe ("Alden"). Mr. Hajjar is truly remorseful for the trust he betrayed, particularly that of Alden's president, who Rick and his family have known for decades. After Alden discovered these crimes, Rick's remorse compelled him to take full responsibility, and he immediately began to liquidate nearly all of his assets to pay restitution to Alden – all before law enforcement became involved. Additionally, Rick fully cooperated with Alden's investigation, answering Alden's requests for information and helping in any way he could to aid Alden's efforts to recover assets from all culpable parties, including himself. Rick knows that he will never be able to repair the trust he breached, but his considerable efforts toward restitution will likely result in the eventual return of more than $5 million to Alden, in addition to the money Rick will continue to pay in restitution following his release.

Based on the amount of money at issue, one might assume that this was a crime solely based on greed and self-interest, committed by a calculated criminal. But this case, much like Mr. Hajjar, presents a confounding set of circumstances defying expectations and requiring further contextualization. Without seeking to minimize the gravity of his offenses or to depreciate that Rick enriched himself directly and indirectly through his offenses, Rick respectfully submits this memorandum and accompanying letters of support to provide the necessary context to assist this Court with determining a sentence that is sufficient, but not greater than necessary to fulfill the purposes set forth in 18 U.S.C. § 3553(a).

Mr. Hajjar, age 65, comes before this Court having plead guilty, at the first available opportunity, to an information charging him with wire fraud in violation of 18 U.S.C. § 1343 (Count One), unlawful monetary transactions in violation of 18 U.S.C. § 1957 (Count Two), and filing a false tax return in violation of 26 U.S.C. § 7206(1) (Count Three). Mr. Hajjar, the Government, and the Probation Department agree the Total Adjusted Offense Level is 29. Pursuant to the Rule 11(c)(1)(c) plea agreement, the Government and Mr. Hajjar have agreed that an appropriate sentence for Mr. Hajjar includes a period of incarceration of not less than 48 months and not more than 74 months, 36 months of supervised release, a mandatory special assessment of $300, forfeiture, and restitution. *See* ECF 3. The Government and Mr. Hajjar came to this agreement after extensive discussions about the particular facts of the case, Mr. Hajjar's conduct, his efforts to pay restitution to Alden, Mr. Hajjar's extensive cooperation with the Government, and in light of the fact that this is a substantial sentence for a 65-year-old first time offender. For the reasons discussed herein, as well as those raised during the sentencing hearing, Mr. Hajjar respectfully submits that the appropriate sentence is at the low end of the range agreed to in the Parties' Plea Agreement.

II.    **Mr. Hajjar's Personal Background and Character**
    A.    **Brief Personal Overview**

Richard Hajjar is a 65 year-old man with no criminal history. Pre-Sentence Report

("PSR") ¶¶ 54-60, 62. When Alden discovered the embezzlement in October 2019, Rick

promptly took responsibility and began working with Alden to return as much money as

possible. Rick's efforts were unprompted by law enforcement; he voluntarily cooperated with

Alden for almost a year before the government became aware of his misdeeds, knowingly

exposing himself to certain criminal and civil liability. Rick's motives for cooperating with

Alden were simple: he was truly remorseful for betraying the trust of everyone at the company.

He was devastated to realize that his actions had potentially exposed the company to financial

trouble, and he wanted to do whatever he could to mitigate the financial damage he caused. In

the months prior to law enforcement involvement, Rick demonstrated true remorse by: (1)

liquidating nearly all of his assets so that he could give as much as possible, as quickly as

possible, back to Alden; (2) assisting Alden's investigation and asset recovery efforts against

"Individual 1," to whom Rick had given a majority of the stolen funds; and (3) assisting Alden in

pursuing civil claims against all parties potentially liable to Alden, including himself.

When the government became aware of Rick's misdeeds, he continued to take full

responsibility. Rick cooperated with the government's investigation, assisting in its effort to

locate and identify assets that could potentially be returned to Alden. Furthermore, Rick provided

complete and accurate information to the government, during a series of multi-hour proffer

sessions, which expedited the government's investigation and prosecution.

As the letters submitted by his family and friends demonstrate, Mr. Hajjar – or "Ricky,"

as his family affectionately call him – is a reserved man, who cares deeply about his family and

those around him. A common thread running through these reflections is that Rick always puts

others before himself, and he has an insatiable desire to make those around him happy.

Unfortunately, as several of those close to him surmise, it may have been these otherwise

admirable qualities that, in part, led Rick to commit the crimes at issue. *See* Exs. D, K, I. While

Rick unequivocally admits to also stealing from Alden to support his own lifestyle, a majority of

the funds at issue were stolen to invest in a pseudo-celebrity's start-up companies, and the

lifestyle that went along with those endeavors. PSR ¶ 8-13. However delusional this seems to

anyone with clear judgment, Rick believed that these investments of Alden funds would be

returned tenfold when Individual 1's ventures attained popularity and profitability. When

Individual 1 "hit it big," Rick would be able to return every penny he had stolen. Mr. Hajjar now

realizes that this was not only delusional thinking, but this grandiose idea was criminal because

the second he abused his position of trust and stole money from Alden, for any reason, he

committed a crime. For this, and for all of the anguish, stress, and hurt Mr. Hajjar has caused, he

is deeply sorry, forever remorseful, and will work until the day he dies to pay restitution to

Alden.

### B.    Rick Hajjar's Family and Upbringing

Rick grew up in a humble and hardworking Lebanese-American family in Braintree. PSR

¶ 62. His father, William, was a Certified Public Accountant and his mother, Linda, was a

homemaker. See PSR at ¶¶ 62-64. Rick, along with his five brothers and sisters, grew up in a

close-knit but strict family that was a fixture of their community. PSR at ¶¶ 65-71.

Despite his reserved and solitary demeanor, Rick demonstrated a steadfast sense of

responsibility to his family from a young age. When Rick was twelve, his oldest brother Doug

deployed to serve in Vietnam. Ex. A. Sensing the vulnerability created by Doug's absence, Rick,

without prompting, did everything he could to help fill the void while Doug was serving our

country. *Id*. Doug, a 4-Star General Creighton Abrams Intelligence Office and recipient of the Bronze Star Medal for his service in Vietnam, refers to Ricky as his "shining light" during that time for his commitment to taking care of Doug's young family. *Id*. In Doug's letter of support he provides the following poignant reflection of Rick's character, even at a young age: "When I returned home after a year at war, and feeling proud serving my country, I was most proud of my little brother Ricky and how much he contributed to my family's well-being." *Id*. Without making excuses for his brother, Doug explains that despite the "out-of-character disaster" that brings Rick before the Court, Doug is still proud of Rick, particularly for taking responsibility and working to liquidate nearly all of his assets to pay restitution to his former employer and long before the government became aware of his misdeeds. *Id.*

Rick's brothers and sisters describe "Ricky" growing up as a "shy kid [who] never had many friends" but who was very close with his family. Ex. G. "As time went on, not much changed[,]" and that shy kid, grew into an adult with a "reserved personality and [] gentle kindness," who preferred to watch others' happiness from the sidelines, never being the center of attention. Exs. G, B, E. Rick's sister Yana describes him as "the quietest of all my siblings, but the one with the biggest heart, the most compassion for others and the one who always steps up when we need him most." Ex. B; PSR ¶ 70. When Rick's father was sick and dying from kidney failure, Rick tended to him and never left his mother's side. Rick continued to be the one to support his mother long after his father passed. Ex. B; PSR at ¶ 63. As Rick's mother succumbed to dementia, so too did Rick support her in her final days, never leaving her side until the very end. Ex. B; PSR at ¶ 64. Rick's characteristic compassion was also on full display when his sister's husband unexpectedly passed away. As Linda recounts in her letter of support:

> Rick was either on the phone calling me several times a day or at my house in Weston. He helped with my children and with my

> errands. He was very quiet, like my Dad, but his constant support
> through that horrible time in my life gave me the strength to heal. I
> thanked God many a night for my younger brother!

Ex. G.

It is this Rick that the entire Hajjar family knows and loves. As Rick's sister Yana summarizes,

"Ricky always puts others before himself, wanting them to be happy – he gets pure joy out of

seeing this and he never expects anything in return." Ex. B.

Rick has also had his share of personal health troubles and times of need, having suffered

for years from membranous glomerulonephritis, a chronic kidney disease. PSR ¶ 79-82; Ex. B.

Rick never asked his friends or family for help because he did not want to burden them. Through

the numerous chemotherapy treatments Rick underwent between 2014 and 2017, he never asked

for so much as a ride to the doctor's office, not wanting to impose on his family. *Id.* Although

Rick is now in remission, it is something that continues to plague him, along with a number of

other ailments. Indeed, it is this selfless and caring person that the entire Hajjar family so deftly

summarizes in their letters of support:

- "Uncle Ricky never forgot a [niece's or nephew's] birthday, graduation, wedding or event in their lives or their children's lives." Ex. A.
- "My husband and I named our only child after Ricky 23 years ago, telling our boy that his namesake is a kind, compassionate and thoughtful human being. . . ." Ex. B.
- "Richard has always been devoted to the well being of his family and friends. I have witnessed his kind, considerate and compassionate manner on many occasions." Ex. F.
- "He is shy, quiet, unassuming, and an observer from the sidelines. . . . [At Christmas] Ricky did not want to be recognized as the giver, but he would be genuinely smiling and sometimes even accidentally snorting quietly as he stood, always, on the outskirts of the family room. Uncle Ricky thrived on providing joy to others, whom he adored." Ex. K.
- "One of my most treasured memories is of him taking me and my sisters down the street to the corner store to pick out some candy. It was a small gesture, but made us feel special. I remember being around 8 years old, and Ricky surprising me and my younger sisters by picking us up and taking us to the Stone Zoo and Burger King for the day." Ex. J.
- "[M]y uncle Richard stood out as someone who truly cared about the wellbeing of each member of his large family, as well as the things that were important to them. . . .[O]ne thing that has been very evident to me for my entire life is how much sincere interest he has taken in each of our lives, from birth to adulthood." Ex. M.

Just like his family, Rick's small, but close, circle of friends provide an important glimpse into his once very private personal life. One of his close friends knows him as "an incredibly generous person. And this is not in a strict financial sense at all. It is his devotion to helping others at any given time. Rick has been instrumental in the community" in helping support and organize a multitude of fundraisers. Ex. E. ("His concern and compassion has always been focused on others"). Rick's best friend and former business partner describes him as "a generous and caring human being. . . . I know Rick has always put others' needs before his own self." Ex. H. Another friend further professes Rick's selflessness and desire to help and to please others: "He selflessly gives of his time, knowledge and assistance to anyone who asks. My family and friends consistently hold him in high regard as a very nice person who would do anything for you, and he often did." Ex. D.

Although his friends and family describe him as an eminently caring and family-oriented person, Rick was only married briefly and never had children. Rick's lone failed marriage devastated him. Ex. G. Rick's sister Linda reflects that "[o]f all my brothers, I thought he was the one meant to have a family. He always loved children and my many nieces and nephews were always drawn to him." *Id.* Amy Hajjar similarly shares that "I truly believe Ricky would have made an amazing father." Ex. J. Instead, Rick has always been the person on the sidelines, away from the spotlight, enjoying others' happiness from the periphery. Exs. A, E, F. Despite never having kids and living a relatively solitary existence for most of his adult life, "[a]fter the divorce, Rick adopted Sally, a pug, whom he treated like a child. Sally was his pride and joy. He loved her fiercely and she quickly became a part of our extended family. It seemed like Sally may have compensated for the children Rick should have been lucky enough to have but never did." Ex. G. Similarly, Rick's sister Yana describes Rick's love for his dog Sally "as a father

7

loves his only child, doting over her for her entire life. He was truly devastated when she died in 2014." Ex. B.

### C.     What Taking Full Responsibility Means to Rick Hajjar

When Rick's misdeeds were uncovered, he took full responsibility. In the subsequent days, weeks, and months, Rick committed himself to liquidating nearly all of his assets to pay restitution to Alden – as much as possible, as fast as possible. All the trappings of the life he once lived were handed over to Alden as restitution. Although Alden may never recover the full amount of what was taken, it will likely recover in excess of $5 million in funds (but hopefully more) returned by Rick directly, recovered from third parties with Rick's assistance, and from the proceeds of the sale of Rick's home that he voluntarily forfeited. See PSR ¶ 19a.[1]

Rick's remorse and desire to mitigate the damage he caused are also reflected in his efforts to cooperate with Alden's investigation to recover assets from third-parties. Rick produced thousands of pages of his own personal and financial records to the company, provided detailed information about how he perpetrated his embezzlement, explained where the funds were sent and invested, and cooperated with every request Alden made. This was all so that Rick could help Alden recover as much as possible. This cooperation was particularly important given that the overwhelming majority of money taken from the company was invested with, and given to, Individual 1.

In sum, the sincerest manifestation of Rick's remorse is the fact that he liquidated nearly every asset in his name to pay restitution to Alden and long before the government became aware of his crime. Rick will leave prison penniless and homeless, having handed over everything he

---

[1]     The current restitution figure paid to Alden ($3,291,784.33) does not reflect the proceeds from the eventual sale of Rick's forfeited home, substantial jewelry, or the cooperative apartment in New York City. Once these assets are sold, it is almost certain that several million more dollars will be returned to Alden.

owned, including his home. Rick is committed to working the rest of his life to pay Alden as much restitution as he can. When Rick emerges from prison, he plans to go into business with his sister, enabling him to make a meaningful effort to pay restitution back to Alden. PSR ¶ 92.

**III.    A Below-Guidelines Sentence of Forty-Eight Months of Incarceration Is a Fair, Just, and Sufficient Sentence That Meets the Sentencing Goals Of 18 U.S.C. § 3553(a)**

As this Court is well aware, the Sentencing Guidelines are merely a factor in its decision to impose a punishment "sufficient, but ***not greater than necessary***" to serve the enumerated statutory goals. 18 U.S.C. § 3553(a) (emphasis added). The mechanical calculation of the Sentencing Guidelines is only the beginning of this Court's inquiry, and the Court "may not presume that the Guidelines range is reasonable." *United States v. Gall*, 552 U.S. 38, 49-50 (2007). The hallmark of this analysis is a flexible, case-by-case approach, where this Court "should not consider itself constrained by the Guidelines to the extent that there are sound, case-specific reasons for deviating from them. Nor should a sentencing court operate in the belief that substantial variances from the guidelines are always beyond the pale." *United States v. Martin*, 520 F.3d 87, 91 (1st Cir. 2008). At base, the "court's reasons for deviation should typically be rooted either in the nature and circumstances of the offense or the characteristics of the offender; must add up to a plausible rationale; and must justify a variance of the magnitude in question." *Id. at* 91, 93 ("A district court therefore may take idiosyncratic family circumstances into account, at least to some extent, in fashioning a variant sentence"); *United States v. Prosperi*, 686 F.3d 32, 48-49 (1st Cir. 2012) (affirming 100% variance based on, among other factors, personal circumstances of defendant); *United States v. Flynn*, 15-CR-10283 (D. Mass. May 9, 2017) (imposing a forty-eight month sentence, approximately 40% below the low end of Guidelines, for $21 million fraud, based on defendant's characteristics and circumstances);

*United States v. Caspersen*, 1:16-cr-00414 (S.D.N.Y. Nov 16, 2016) (imposing forty-eight month sentence where Guideline range was 151-188 for $38.5 million fraud).

The parties agree that Mr. Hajjar's offense level under the Guidelines is 29. PSR ¶ 2. Given Mr. Hajjar's personal characteristics, his level of remorse, cooperation (both pre and post government involvement), and the restitution he has provided, the Government and Mr. Hajjar agree that a below-Guidelines sentence is appropriate.[2] In addition to the other conditions of his Plea Agreement, the Parties agree that Mr. Hajjar should be sentenced to a term of incarceration of between 48-74 months. For the reasons asserted herein, Mr. Hajjar respectfully submits that a term of incarceration at the low end of the range set forth in the Plea Agreement is "sufficient, but not greater than necessary" to fulfill the statutory goals set forth in 18 U.S.C. § 3553(a).

## A.    Circumstances of the Offense

Mr. Hajjar does not contest the Statement of Offense Conduct as set forth in the Plea Agreement, Information, and the PSR. He used his position of trust to embezzle approximately $30 million from Alden. He hid his crimes from the company, and his actions put the company, and everyone who worked there, in jeopardy. Rick is deeply ashamed of what he did and is remorseful for the harm he caused and the trust he betrayed.

It is almost unfathomable to think that the "Uncle Ricky" the Hajjars describe in their letters of support could have done this. Without diminishing Rick's responsibility for these crimes, the following is intended to provide a more robust picture of this offense and to begin addressing the obvious lingering question: why would Rick do this?

Mr. Hajjar unequivocally enriched himself through his crimes, but this was not simply a crime of greed or a scheme perpetrated by a calculated predator. As his family and friends have

---

[2]    The Sentencing Guideline range for an individual with a Criminal History Category I and an offense level of 29 is 87–108 months of incarceration.

described, Rick's most admirable qualities – his generosity, desire to make others happy, and care for those close to him – combined with his inability to say "no" culminated in this "out-of-character disaster." Ex. A. Of the approximately $30 million Rick took from Alden, he invested and gave to Individual 1 approximately $20 million, and all done with the sincere intention that the funds would be repaid when Individual 1 attained celebrity status and her companies attained profitability. See PSR ¶8. It bears repeating that Rick fully admits that he benefited directly and indirectly from the money he took from Alden and invested in Individual 1; he also used a portion of what he stole to support his own lifestyle. But it was always his sincere, albeit delusional, intention to return all misappropriated funds when Individual 1's ventures achieved success and began producing tenfold what had been invested. Rick persisted with this belief for months even after Alden discovered his thefts and only recently has he acknowledged that these ventures will not "hit it big," such that all of the funds would be returned to Alden.

The series of events that compelled Rick to steal a substantial portion of the money at issue began when he met Individual 1 on Nantucket. PSR at ¶ 76. When the two met, Individual 1 was a local television personality of quasi-celebrity status in the Boston area. Rick, a reserved man without a large cadre of friends – his closest companion being his dog Sally – was immediately enthralled with Individual 1's energy and magnetism. She was everything Rick was not – outgoing, dynamic, and thriving in the spotlight. To Rick, Individual 1 seemed destined for celebrity and success. However improbable, they forged an intimate but non-sexual friendship, communicating daily. PSR ¶ 76. Indeed, Individual 1 quickly became the center of Rick's universe. Rick, the person who once preferred to stay home and read a book on his sofa, was seen following Individual 1 around Boston and Nantucket. *See* Ex. E.

Rick recalls that Individual 1's career aspirations required her to put Boston in the rear view mirror and set her sights on a brighter spotlight. This meant, among other things, starting a production company to create an eponymous television show. See PSR ¶ 8. Launching a television show, however, was unattainably expensive, and Individual 1 needed investment capital. After countless conversations about creating this dream project, as he had done so many times throughout his life, Rick offered to help. Sight unseen, Rick agreed to invest in the fledgling production company; he was ready to pour his life savings into the project. Rick had done well in his professional career and as a stock market and real estate investor, so he thought he could afford a meaningful investment.

What Rick thought was going to be an investment of a few hundred thousand dollars transformed into a need for a million, and then millions more. But Rick did not have millions, and he was in way over his head. Instead of admitting that he did not have the money – that he could not be her knight in shining armor – Rick chose to steal money from Alden's cash reserve accounts to invest in the project and supply to Individual 1. PSR ¶¶ 8-10. Rick, the CFO of Alden, believed that he could leverage the funds in these reserve accounts without impacting the business or raising suspicion. He had taken comparatively small amounts of money from these accounts prior to meeting Individual 1, believing Alden had not been impacted. PSR ¶ 8. These investments were memorialized in a series of formal production financing agreements with Individual 1 and her lawyer. PSR ¶ 8. Rick did not have a lawyer because he thought that he was Individual 1's partner and did not need one. This evolving arrangement was further consummated in countless promises between the two friends/business partners.

However absurd it now seems, the idea was simple: Rick was so certain of Individual 1's success that he would take money from Alden's cash reserve accounts to finance Individual 1's

production company, her lifestyle, and her brand. *See* PSR ¶¶ 9, 12. When she attained celebrity status and profitability, Individual 1 would repay Rick everything he invested and gave to her, with a massive return on his investment. Rick would then use that to return everything he stole. PSR ¶ 8. In the meantime, Rick replenished the stolen funds with a line of credit that Alden maintained, making it appear that the cash reserves were intact. PSR ¶ 14. In this delusional thought process, Individual 1's commercial ventures would be so successful that there was really no risk of not being able to repay the money invested in the production company, the millions of dollars Individual 1 used to purchase luxurious clothing and jewelry to support her public persona (all paid for with Alden funds), the $900,000 Rick gave her to purchase a condominium in New York City, and even the money that Rick had kept for himself to support the unsustainable lifestyle he began to enjoy as he started stealing from Alden. PSR ¶¶ 9-12. It may have even seemed to Rick that this dream was going to work when Individual 1's show was briefly picked up by a network and received a fleeting measure of success.

The unrelenting cascade of Individual 1's business related expenses overwhelmed Rick, but he felt like he could not say no with success seemingly within reach. So Rick chose to continue stealing from Alden. When the cash reserve accounts were depleted, Rick surreptitiously took out additional lines of credit on behalf of the company to continue the charade. PSR ¶ 13.

When the television show was placed "on hiatus," Rick held out hope that it would have a swift return, but that was not the case. While still attempting to revive the show, the dream of success and celebrity status mutated into launching a high end cosmetics company. Much like the production company, the cost of launching a cosmetics company was immense. With the Alden cash reserves long since depleted and the first lines of credit drawn down, Rick doubled-

down on his gamble. He took out larger lines of credit to pay off the prior lines. PSR ¶¶ 13-14

That was how Rick was able to continue wiring money, without question, in response to

Individual 1's monthly requests to the effect of "[d]id my July tally. Can you wire 234,956."[3]

Rick also received reassurances that everything was going to work out and that a "huge payday"

was on the horizon so that Individual 1 would make Rick "whole."

The cosmetics endeavor, like the production company, never attained a modicum of the

success that Rick was certain it would. In the fall of 2019, Alden learned of its CFO's crimes. To

any reasonable person, particularly at that point, any possibility of that investment yielding a

return was doomed. But even after Rick was in the process of liquidating nearly everything he

owned to pay restitution, he still believed, at least initially, that one of Individual 1's companies

would attain success and steady the financial turbulence his crimes had caused.

**B.**    **A Sentence On the Low End of the Range Set Forth in the Parties' Plea Agreement Is Substantial but Not Greater Than Necessary to Effectuate the Purposes of 18 U.S.C. § 3553**
>    *1.    Mr. Hajjar's Personal History, Characteristics, and the Collateral Consequences of His Actions Support a Below Guidelines Sentence*

Mr. Hajjar agrees that his crimes, regardless of what motivated them, are serious and that

he must pay a conspicuous price in the form of a prison sentence. That said, Mr. Hajjar has

already paid a significant price for his crimes, and his personal and family characteristics warrant

a below-Guidelines sentence on the low end of the range set forth in the Plea Agreement.

Rick is a 65-year-old, first time offender. He has led an otherwise law abiding life.

Although the duration of his misappropriation takes these circumstances outside the realm of

aberrant behavior, the eloquent, and brutally honest, letters of support make clear that Rick is a

good person and is so much more than the crimes for which he has pled guilty. He is a kind-

---

[3]    As part of his efforts to cooperate with the Government, Rick produced all of his text messages with Individual 1, including the messages referenced herein.

hearted, gentle human being who cares deeply for those around him. As each of the letters of support emphasize, Rick has always been the person who has cared for others and gone out of his way to improve the lives of those around him. As several family members assert, it was likely these otherwise virtuous attributes that transformed into the vices that motivated Rick's acts. To the outside world, especially before meeting Individual 1, Rick led a relatively solitary and uneventful life. He was single, he did not have kids, he had few friends, and his closest companion for many years was his dog Sally, which all made Rick particularly susceptible to choosing this path.

Aside from the sentence that this Court will impose, Rick has already paid a significant price for his crimes. When not endeavoring to pay restitution back to Alden, Mr. Hajjar's last two years have been predominantly spent alone, at his home, away from even his family and his small circle of friends, upon whom he used to rely for support and companionship. The person who preferred to stay out of the spotlight has been the subject of public humiliation and publicity. To put it bluntly, Mr. Hajjar's career and ability to achieve professional success in the way that he has known for years is dead. The collateral consequences Mr. Hajjar has endured, in conjunction with his good character, are significant factors warranting a reasonable downward departure from the Guidelines. *See United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence."); *United States v. Nesbeth*, 188 F. Supp. 3d 179, 180 (E.D.N.Y. 2016). The price the Hajjar family will pay while Rick is incarcerated, for any amount of time, will also be tremendous. The warmth of those famous Hajjar family Christmas celebrations will be chilled by Uncle Ricky's absence, particularly as his older siblings approach the twilight of their lives. *United States v. Thurston*, 544 F.3d 22, 25 (1st Cir. 2008) (affirming

15

substantial Guidelines departure due to defendant's characteristics and acceptance of
responsibility).

Mr. Hajjar's age, health conditions, and future outlook also support a below-Guidelines
sentence. As Rick approaches his seventies, his current underlying medical conditions,
specifically his chronic kidney disease (membranous glomerulonephritis) will only require more
attention and potentially more treatment. Thankfully, Mr. Hajjar is currently in remission, but a
prison sentence that substantially exceeds forty-eight months will only serve to needlessly
imperil Mr. Hajjar's health, without meaningfully furthering any of the § 3553(a) factors. *See
United States v. Willis*, 322 F.Supp. 2d 76 (D. Mass. 2004) (Downward departure appropriate
considering age, medical conditions, and future care needs).

> 2. *Mr. Hajjar's Remarkable Acceptance of Responsibility and Efforts to Pay
> Restitution to the Victim Further Support a Below-Guidelines Sentence*

A sentence departing from the Sentencing Guidelines is also appropriate in light of
Rick's efforts to cooperate with the victim and pay restitution, all before the authorities were
involved. When his misdeeds were uncovered, Rick voluntarily liquidated nearly all of his assets
so that he could pay restitution to Alden as fast as possible. He did this for two primary reasons.
First, Rick knew he wronged Alden and this was the most tangible way of demonstrating his
remorse and desire to mitigate the harm caused. Second, Rick knew that his actions created
financial uncertainty for Alden, so instead of working to insulate himself from criminal and civil
liability, he immediately worked to return substantial assets to the company and assisted them in
recovering assets beyond what he could give them directly. Fortunately, it appears that Alden
will weather this storm.

Rick exhibited this same level of acceptance of responsibility as soon as the government
became aware of his crimes. Beyond the foregone conclusion that he would plead guilty, Rick

cooperated with the Government and provided truthful, accurate, and comprehensive information about his crimes during a series of hours-long proffer sessions. Regardless of the sentence imposed, in large part due to his *voluntary* efforts to pay restitution, Rick will emerge from prison penniless and homeless, and will work until the day he dies to pay restitution back to Alden. Rick and his sister are planning on going into business together, which, for a convicted felon, puts him in the unique position to make a reasonable living and continue making meaningful progress towards paying restitution. That effort to continue paying restitution will only be further delayed with a prison sentence substantially exceeding forty-eight months. In sum, Rick's efforts demonstrate sincere remorse, true acceptance of responsibility, a sincere effort to pay restitution, and support a below-Guidelines sentence within the range set forth in the Plea Agreement.

> 3.     *A Forty-Eight Month Sentence Will Satisfy the Goals of Specific and General Deterrence*

A sentence at the low end of the range agreed to by the Parties satisfies the goal of specific deterrence, and adding to that sentence will do nothing to further that goal. Based on the collateral consequences discussed above, his sincere remorse for his crimes, and the simple fact that he will never again occupy a position of trust at any company, there is no chance Rick will reoffend. Above and beyond Rick's remorse for his crimes, it is important to consider that Rick is a first-time offender, which courts frequently recognize makes the chances of re-offense highly unlikely after a brief period of incarceration. *United States v. Germosen,* 473 F. Supp. 2d 221, 227 (D. Mass. 2007) (recognizing that there is "a demonstrable difference in the recidivism rates of real first offenders as compared to other defendants in Criminal History Category I") (citation omitted); *see United States v. Watt*, 707 F. Supp. 2d 149, 158 (D. Mass. 2010). Rick is 65 years-old, he has been utterly disgraced by his crimes, he has lost everything as the result of his

actions, and he is truly remorseful for the betrayal of trust he committed. There is no threat that he will recidivate.

A sentence at the low end of the range set forth in the Plea Agreement is also sufficient to fulfill the goal of general deterrence. *See* 18 U.S.C. § 3553. Any individual who is aware of Mr. Hajjar's case would never knowingly choose to endure what his is currently experiencing, irrespective of whether Mr. Hajjar is sentenced to forty-eight months of imprisonment or a longer term. The message is simple, regardless of one's intentions: if you steal from your employer for the purposes of self-enrichment or a wayward investment – even if you believe it will all be repaid – you will lose everything. Rick's decision to take from Alden destroyed the life he built and will erase valuable years he would have otherwise spent with his family. Forty-eight months of imprisonment, in conjunction with the collateral effects of his crime, including the publicity and humiliation Rick has faced, is sufficient to deter others from committing similar crimes. There is powerful general deterrent value to sentencing a sixty-five-year-old man to forty-eight months of imprisonment, particularly where he will emerge from prison destitute, homeless, and indebted to his victim for the rest of his life.

### 4. *The Motive Behind the Overwhelming Majority of the Loss Supports a Below Guideline Sentence*

Mr. Hajjar takes full responsibility for all of the money he stole from Alden regardless of his motivation for taking it, how it was used, or his intention to pay it all back. But for purposes of determining an appropriate sentence, the context of his misdeeds is important to consider here. While "loss serves as a measure of the seriousness of the offense and the defendant's relative culpability" under the Guidelines, U.S.S.G. § 2B1.1, courts throughout the country have criticized the Sentencing Guidelines' emphasis on the loss amount without an empirical basis. *United States v. Gupta,* 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012) ("The notion that this

complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense"); *United States v. Musgrave,* 647 F. App'x 529, 538-39 (6th Cir. 2016) ("[T]he data suggest that loss is an unsound measure of the seriousness of many offenses, with the result that judges are increasingly willing to go below the Guidelines when they impose sentences in white-collar cases.") (quotation omitted).[4] Recognizing the incongruity between measuring culpability purely by the monetary loss at issue, the ABA Criminal Justice Section Task Force proposed a framework for viewing categories of motive when analyzing the nature of the offense. *A Report on Behalf of The American Bar Association Criminal Justice Section Task Force on The Reform of Federal Sentencing for Economic Crimes*, November 10, 2014.[5] That Report details a spectrum of culpability from "predatory," indicating there was no legitimate purpose to the fraud and it was only intended to inflict loss, to lesser degrees of culpability including "Legitimate ab initio" and "risk shifting" where "offenses are not specifically intended to cause loss. Instead, they shift the risk of any potential loss from the defendant (or from others involved in the criminal undertaking) to a third party, such as the victim of the offense." *Id.*

Rick did not steal from Alden with malice or a predatory state of mind. The money Rick stole from Alden was predominantly used to invest in Individual 1's companies, her lifestyle, and future success. Rick did not have the money to launch these ventures on his own, and fearing letting down this individual with whom he had become enamored, he stole from Alden to make

---

[4]      As a point of reference, Mr. Hajjar's total offense level is driven almost entirely by the amount of the loss in this case – 22 of the points of Mr. Hajjar's 29 point Offense Level is due to the dollar amount of the loss. As many Courts have observed, the penalties for financial fraud cases have increased exponentially without any empirical basis to substantiate these increased sentences. *See United States v. Adelson*, 441 F. Supp. 2d at 506, 509 (S.D.N.Y. 2006) (noting the "inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended in financial loss . . . without however, explaining why it is appropriate to accord such huge weight to such factors").

[5]      The Report can be accessed here:
https://www.americanbar.org/content/dam/aba/publications/criminaljustice/economic_crimes.pdf

the investment and support her lifestyle and brand. He was certain that her success would create a tenfold return on the investment, and that all of the money he took from Alden would be repaid. Even the money that Mr. Hajjar took for himself would be repaid. Although this does not diminish the economic harm inflicted on Alden, Mr. Hajjar's motivations, however delusional, are important considerations in determining a just sentence within the range set forth in the Plea Agreement.

## IV. <u>Conclusion</u>

For the reasons submitted herein, as well as those articulated at the sentencing hearing before this Court, Mr. Hajjar respectfully submits that in addition to the other terms set forth in the Plea Agreement, a period of incarceration at the low end of the 48-74 month range is a fair, just, proportionate, and sufficient sentence to meet the § 3553(a) sentencing objectives. For a 65-year-old first time-offender, this is a significant sentence. Moreover, a downward departure is appropriate here given Mr. Hajjar's sincere acceptance of responsibility and considerable efforts to make restitution to the victim.

Respectfully Submitted,
RICHARD G. HAJJAR

By his attorneys,

/s/ Cory S. Flashner
Daniel F. Conley (BBO # 541830)
Cory S. Flashner (BBO # 629205)
Edmund P. Daley III (BBO # 692290)
MINTZ, LEVIN, COHN, FERRIS,
   GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA 02111
(617) 348-1605
DFConley@mintz.com
CSFlashner@mintz.com
Dated: September 10, 2021        EPDaley@mintz.com

## <u>CERTIFICATE OF SERVICE</u>

I, Cory S. Flashner, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as nonregistered participants on September 10, 2021.

*/s/ Cory S. Flashner*
Cory S. Flashner

116142595v.1